IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2023

## STATE OF TENNESSEE v. NAKOMIS JONES

**Appeal from the Criminal Court for Shelby County**
No. 02-02917        Melissa Boyd, Judge

_____

### No. W2022-01638-CCA-R3-CD

_____

For events in 2001, a Shelby County jury convicted the Petitioner, Nakomis Jones, of murder, kidnapping, and gun related charges, and the trial court sentenced him to an effective sentence of life in prison plus thirty-eight years. The Petitioner unsuccessfully appealed his convictions, as well as filed for post-conviction relief, Federal habeas corpus relief, and motions to reopen the denial of relief in each instance. As relevant here, in 2022, the Petitioner filed a petition pursuant to the Post-Conviction Fingerprint Analysis Act of 2021. He sought fingerprint analysis of the palm print and a handgun collected during the investigation. The post-conviction court summarily dismissed the petition. On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and MATTHEW J. WILSON, JJ., joined.

Nakomis Jones, for the appellant, Pro Se.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Stephen J. Mulroy, District Attorney General; and Paul M. Lichlyter, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the Petitioner's killing of a man and kidnapping of the man's brother. For these offenses, a Shelby County jury convicted the Petitioner of two counts

of first-degree felony murder, one count of second-degree murder, two counts of especially aggravated kidnapping, and three counts of being a felon in possession of a weapon. The trial court merged the murder convictions, merged the especially aggravated kidnapping convictions, and merged the convictions for being a felon in the possession of a weapon and sentenced the appellant to consecutive sentences of life, thirty-five years, and three years, respectively.

## A. Trial and Procedural History

The Petitioner appealed his convictions and sentence, and this court summarized the facts presented at trial as follows:

Kevin Wiseman testified that he and Jesse Windom were brothers and sold used cars together at Just for You Auto Sales in Memphis. On August 7, 2001, Windom had been working at the car lot, which closed at 5:00 p.m. About 6:00 p.m., Windom telephoned Wiseman and asked him to come to the lot in order for Windom to get a set of keys from Wiseman. Wiseman went to the lot and met Windom, who was driving a black Lexus. A white Dodge Stratus with three African-American men inside pulled into the lot, and the driver of the Stratus got out and began talking to Windom. Wiseman related that the man appeared to know Windom but that Wiseman did not know any of the men in the Stratus. A second man got out of the Stratus and approached Wiseman, and Wiseman saw that the man had a gun. The third man remained in the Stratus but pointed a sawed-off shotgun out of the car and told Wiseman that he would shoot if Wiseman tried to run. The first man, who had been talking to Windom, pulled up his shirt and showed that he had a gun in his pants. Wiseman identified codefendant Norris Ray as the first man and the [Petitioner] as the second man. Wiseman related that the third man, who remained in the Stratus, was never identified.

Ray got into Windom's Lexus and started the engine. The [Petitioner] then ordered Wiseman to get into the Lexus'[s] trunk. The car started moving, and Wiseman heard a man tell Windom, "[T]ell me where the money is or I'm going to kill you." Wiseman then heard Windom say, "I don't have any money, the police done took it all." After five or ten minutes, Wiseman heard a gunshot and heard Windom yell. He then heard a car door close and heard a man say, "[T]here go the police. You know they're coming." Wiseman recalled that the car began making a lot of turns and that he was sliding around in the trunk. He then heard the car engine cut off and heard the car doors close. Wiseman waited ten or fifteen minutes and began pounding on the trunk. As he was wiping sweat off his face, he hit the inside trunk latch and the trunk popped open. Wiseman said that the men were gone and that he was in the Southwood apartment complex, which is next to the

2

Flairwood apartment complex. He got out of the trunk and saw a friend, who agreed to drive him back to the used car lot. As they were driving, they saw an ambulance at a Mapco convenience store. They stopped at the store and learned that Windom had been shot and was in the ambulance. Windom later died. Wiseman testified that he went to the police department, looked at a photographic array, and identified Norris Ray as the driver of the Stratus. Two days later, he looked at another photographic array and picked out the [Petitioner's] photograph. Wiseman testified that he was certain Ray and the [Petitioner] were the men who pulled guns on him and his brother. He acknowledged having prior misdemeanor theft convictions.

On cross-examination, Wiseman acknowledged that he initially told police he could only identify the driver of the Stratus. However, two days later he picked out the [Petitioner's] photograph and identified him as the second man who ordered him into the trunk. Wiseman also acknowledged that in his initial description of the second man, he stated that the man had a "medium fade" haircut. He acknowledged that in the [Petitioner's] photograph, the [Petitioner] had braided hair. He said that he recognized the [Petitioner] by his face and that the [Petitioner] did not have braided hair at the time of the robbery. He acknowledged that while the [Petitioner] was pointing the gun at him, he was not focusing on the [Petitioner's] face. He also acknowledged that he never saw who actually got into the Lexus with his brother.

Officer Gary Claxton of the Memphis Police Department testified that on August 7, 2001, at about 6:30 p.m., he was off duty and driving his Nissan Maxima westbound on Winchester Road. He noticed a black Lexus in the lane to turn south onto Tchulahoma Street. Suddenly, a white Dodge Stratus pulled out and nearly hit him. Claxton stated that he swerved to avoid hitting the Stratus and pulled into the turn lane behind the Lexus. He related that all three cars were in the turn lane waiting to turn left onto Tchulahoma and that the Lexus was in front, that his Maxima was behind the Lexus, and that the Stratus was behind the Maxima. While the cars were waiting to turn left, a man jumped out of the backseat of the Lexus and ran into a nearby Mapco parking lot. Claxton stated that the man appeared to be having a panic attack and fell down. The Lexus made a u-turn and drove into the Mapco lot. When the traffic light turned green, Claxton pulled over to let the Stratus pass him. He then wrote down the Stratus'[s] license plate number. The Lexus drove out of the Mapco parking lot and traveled south on Tchulahoma. Claxton began following the Lexus and called a dispatcher to give her the Stratus'[s] license plate number and tell her that "something strange" was going on in the area. Claxton stated that he followed the Lexus for three or four minutes but lost sight of it. He then returned to the Mapco parking lot.

3

Chandra Jones, Norris Ray's ex-fiancé, testified that she owned a 1998 Dodge Stratus. About 5:00 p.m. on August 7, 2001, she loaned the car to Ray and Ray returned the car later that night. About midnight, the police called Jones'[s] apartment and asked her to come outside. Jones met the police outside and told them that Ray was asleep in her apartment. The police asked her to telephone Ray and ask him to come outside, and she did so. On cross-examination, Jones testified that she did not know the [Petitioner] and had never seen him before. She stated that about 6:45 p.m. on August 7, she called her cellular telephone, which was in her car, and a man named Geno answered.

Kim Hughes testified that in August 2001, she lived in the Flairwood apartment complex. On the evening of August 7, the [Petitioner] came to her door, told her that his car had broken down on Tchulahoma Street, and asked to use her telephone. Hughes did not know the [Petitioner] but handed him her cordless telephone. The [Petitioner] appeared nervous and tried dialing a couple of telephone numbers but never completed the calls. While he was using the telephone, Norris Ray walked up to the [Petitioner], and the [Petitioner] handed him the telephone. Ray made a telephone call and said, "Geno, come get us." Ray also told Geno that he was at the Flairwood apartment complex. The next day, Hughes saw information on the news about Jesse Windom's shooting and called Crime Stoppers. As a result of her call, a police officer came to her apartment and showed her photographic arrays. Hughes picked out Ray's and the [Petitioner's] photographs. She said that the [Petitioner] had braided hair when he came to her apartment. On cross-examination, Hughes testified that Crime Stoppers paid her money for her information.

Lieutenant Prentiss Jolly of the Memphis Police Department testified that about 7:35 p.m. on August 7, 2001, he responded to a call at the Mapco convenience store at the intersection of Winchester and Tchulahoma. When he arrived, Jesse Windom had already been transported to the hospital. About 8:15 p.m., Jolly learned that Windom had died. Jolly investigated the case and interviewed Kevin Wiseman and Officer Gary Claxton. As a result of the investigation, the police began looking for a white Dodge Stratus and a black Lexus. Jolly also checked the license plate number that Claxton had provided and learned that the car was registered to Nanny Harris and Chandra Jones. Jolly learned Ms. Jones'[s] address and went to her apartment complex, where he saw a white Dodge Stratus. Jolly telephoned Ms. Jones and asked her to come outside. Ms. Jones came out of the apartment and told Jolly that Norris Ray was her boyfriend and that he was asleep inside the

4

apartment. Ms. Jones then called Ray and asked him to come outside. Ray came out of the apartment, and the police arrested him.

Sergeant Joe Stark of the Memphis Police Department testified that on August 8, 2001, he helped process a white Dodge Stratus and a black Lexus. Stark obtained a fingerprint from the Lexus'[s] outside rear passenger door window. The print was in a downward position, meaning that the person who left the print was either on top of the car or had his hand on the window while the door was open.

Investigator Don Carpenter of the Memphis Police Department testified that he also dusted the Stratus for fingerprints. He recovered a fingerprint from the driver's side window of the Stratus. The print was in a downward position. He also recovered a palm print from the Stratus'[s] outside rear door panel. On cross-examination, Carpenter testified that it was impossible to know how long the prints had been on the car.

Latent Print Examiner Martin Milner of the Memphis Police Department testified that he received the prints that Stark and Carpenter recovered. He submitted the prints to the Automated Fingerprint Identification System (AFIS), a fingerprint database. AFIS gave Milner the names of twenty-five possible matches for the prints. Milner then compared the recovered prints with prints that were on file for those individuals. He concluded that the palm print recovered from the rear door panel of the Stratus matched the [Petitioner] and that the fingerprint recovered from the Stratus'[s] driver's side window matched Norris Ray. Two fingerprints recovered from the Lexus matched Jesse Windom.

Tom Deering, the Interim Medical Examiner for Shelby County, testified that O.C. Smith performed Windom's autopsy. According to Dr. Smith's autopsy report, the victim was shot once in the abdomen. The bullet entered Windom's right flank area and exited his left hip. The bullet cut through Windom's right common iliac artery and right common iliac vein, causing extensive bleeding and death. The victim's blood tested negative for alcohol and drugs.

Kimbery Tanzy testified that she worked for the Shelby County Criminal Court Clerk's Office. The [Petitioner] was convicted of three felony drug offenses in 1996.

Norris Ray testified on his own behalf that about 4:15 p.m. on August 7, he drove Chandra Jones'[s] Dodge Stratus to Geno's apartment. Ray stayed at Geno's apartment for about thirty minutes. Ray's brother, Marvin

5

Jackson, came to Geno's apartment and Ray and Jackson left and went to Jackson's apartment in Frayser. Ray left the Stratus and its keys at Geno's house. About 5:15 p.m., Daphne Love came to Jackson's apartment and Love and Ray drove to Dyersburg. There, they smoked marijuana, had sex, and visited Ray's other brother, Anthony Jackson. Love drove Ray back to Geno's apartment in Memphis about 10:00 p.m. Ray got the Stratus'[s] keys from Geno's girlfriend, drove the Stratus to Chandra Jones'[s] apartment, and went to sleep. At some point, the police called Ms. Jones' apartment and Ray answered the telephone. The police asked to speak with Ms. Jones and told Ray that Ms. Jones'[s] car had been involved in a hit-and-run accident. Ray thought the call was a joke and hung up. The police called back repeatedly, and Ray hung up each time. Finally, he gave the telephone to Ms. Jones and Jones went outside to speak with the police. The police then called Ray and asked him to come outside. Ray left the apartment, and the police arrested him. Ray related that he had seen the [Petitioner] previously but did not know him. He also stated that he did not know Kim Hughes and had never seen her before.

On cross-examination, Ray acknowledged having prior convictions for sexual battery and burglary. He stated that he knew Jesse Windom but that they did not "hang out" together. Ray stated that he was not disputing that Ms. Jones'[s] white Stratus was used during Windom's killing. However, he stated that Geno and two other men must have used Ms. Jones'[s] car and kidnapped Windom and Wiseman.

*State v. Jones*, No. W2004-01583-CCA-R3-CD, 2005 WL 2464681, at *1-3 (Tenn. Crim. App., Oct. 5, 2005), *perm. app. denied* (Tenn. Feb. 27, 2006).

The Petitioner appealed and this court affirmed the Petitioner's convictions and sentence. *Id*. at *1. The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel at trial and on appeal. *State v. Jones*, No. W2009-00258-CCA-R3-PC, 2009 WL 5064962, at *1 (Tenn. Crim. App. Dec. 22, 2009), *perm. app. denied* (Tenn. May 12, 2010). This court affirmed the post-conviction court's dismissal of his petition for post-conviction relief. The Petitioner then filed a petition for writ of habeas corpus in the United States District Court. The Federal court denied him habeas corpus relief. He then filed a Rule 60(b) motion for relief from the Federal court's holding, which the district court denied. *Nakomis Jones v. Jim Morrow*, No. 2:10-cv-02837-STA-tmp, 2016 WL 4544537, at *1 (W.D. Tenn. Aug. 31, 2016). The Petitioner filed a petition to reopen his petition for post-conviction relief, which the court dismissed summarily.

6

Federally, the Petitioner in September 2015 filed for relief from the judgment and order and in December 2015 filed for relief for judicial notice. It appears both motions were unsuccessful.

### B. Post-Conviction Fingerprint Analysis Act of 2021

In May 2022, the Petitioner filed the petition relevant to this appeal pursuant to the Post-Conviction Fingerprint Analysis Act of 2021 (hereinafter "Fingerprint Analysis Act"). He asked that analysis be done on a fingerprint obtained by Sergeant Joe Starks and Detective Don Carpenter from the outside rear passenger door of the White Dodge Stratus used in the kidnapping in this case and owned by Chandra Jones (who is not related to the Petitioner). The petition stated that the prints were submitted to a latent print examiner, Martin Milner, who testified that the print obtained from the Stratus matched the Petitioner's print. The Petitioner argued, however, that he was not able to review the testing as he never received any pictures or copies of any results or reports of the examinations of the palm print.

As a second ground for relief, the Petitioner asked that the weapon, a chrome Lorcin .380 semi-automatic pistol, confiscated at the crime scene by law enforcement officers, be tested for fingerprints. He said he had never been charged with a crime involving a weapon and there was no evidence that he possessed the weapon in this case.

In a supplement to his petition, the Petitioner filed Mr. Kevin Wiseman's homicide witness statement. In it, Mr. Wiseman said that it looked like the assailant in the rear passenger seat (whom he identified as the Petitioner at trial) had a 9mm handgun. The Petitioner also noted that there was a new, more advanced method of fingerprint analysis than what Mr. Milner used in this case.

The post-conviction court summarily dismissed the Petitioner's petition and supplemental petition. It is from this judgment that the Petitioner now appeals.

### II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it summarily dismissed his petition for post-conviction relief pursuant to the Fingerprint Analysis Act. The State counters that the trial court properly denied the petition because the Petitioner failed to support his allegations in his petition. We agree with the State.

The Fingerprint Analysis Act provides that a petitioner convicted of certain enumerated offenses, including first-degree murder,

> may, at any time, file a petition requesting the performance of fingerprint analysis of any evidence that is in the possession or control of the

7

prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in a judgment of conviction and that may contain fingerprint evidence.

T.C.A. § 40-30-403 (2019). Depending on the situation, and after notice to the prosecution and an opportunity to respond, the trial court shall or may order the requested fingerprint analysis. *Compare* T.C.A. § 40-30-404(1) (the court *shall* order analysis if "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through fingerprint analysis") *with* T.C.A. § 40-30-405(1) (the court *may* order analysis if "[a] reasonable probability exists that analysis of the evidence will produce fingerprint results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction"). Both sections 404 and 405 presume the evidence is still available and in such a condition susceptible to analysis, that it has not already been subjected to the type of analysis being sought by the petition, and that the petition is not being made to unreasonably delay execution of the sentence. T.C.A. §§ 40-30-404(2) to (4) and 405(2) to (4).

This court has had only a handful of opportunities to address a case under the Fingerprint Analysis Act, the first being in *Smith v. State*, No. M2021-01339-CCA-R3-PD, 2022 WL 854438 (Tenn. Crim. App. Mar. 23, 2022). *See also Bailey v. State*, No. M2022-01752-CCA-R3-PC, 2023 WL 5448011, (Tenn. Crim. App. Aug. 15, 2023), *no perm. app. filed*; *Garner v. State*, No. M2021-01396-CCA-R3-PC, 2023 WL 166832 (Tenn. Crim. App. Jan. 12, 2023), *no perm. app. filed*; *Barnes v. State*, No. M2022-00367-CCA-R3-PC, 2022 WL 4592092 (Tenn. Crim. App. Sept. 30, 2022), *no perm. app. filed*; *Johnson v. State*, No. M2021-01420-CCA-R3-PC, 2022 WL 2251333 (Tenn. Crim. App. June 23, 2022), *no perm. app. filed*.

In *Smith*, this court determined that case law discussing the DNA Act was helpful for guidance in ruling on petitions under the Fingerprint Analysis Act because the language of the Fingerprint Analysis Act mirrored that of the DNA Act and the appellate courts "have had ample opportunity over the last twenty years or so to interpret the meaning of the DNA Act." 2022 WL 854438, at *13. Accordingly, a trial court is not required to hold a hearing to determine whether a petition for fingerprint analysis should be granted or denied. *Id.* (citing *Elsea v. State*, No. E2017-01676-CCA-R3-PC, 2018 WL 2363589 at *3 (Tenn. Crim. App. May 24, 2018)). The post-conviction court's determination of whether to grant a petition for post-conviction fingerprint analysis is reviewed for an abuse of discretion. *Id.* at *14.

A petitioner must satisfy all four elements of section 404 or section 405 before the trial court will order fingerprint analysis. *Id*. at *13; *see Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011). In this case, the Petitioner requested fingerprint analysis of two separate

8

pieces of evidence: the palm print on the rear passenger window of the vehicle used in the kidnapping and a gun found at the crime scene.

## A. Window Fingerprint

As previously noted, after notice to the prosecution and an opportunity to respond, the court *shall* order fingerprint analysis under certain circumstances. T.C.A. § 40-30-404. One of these requirements includes that:

> (3) The evidence was never previously subjected to fingerprint analysis, was not subjected to the analysis that is being requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis; and

*Id. at* § 40-30-404(3). *Compare* T.C.A. § 40-30-405(3) ("After notice to the prosecution and an opportunity to respond, the court *may* order fingerprint analysis if the court finds that: (3) The evidence was not previously subjected to fingerprint analysis, was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis, or was previously subjected to analysis and the person making the motion under this part requests analysis that uses a new method or technology that is substantially more probative than the prior analysis . . . .") (emphasis added).

In this case, the post-conviction court found:

> [T]he palm-print has already been subjected to fingerprint analysis. The prints were run through the Automated Fingerprint Identification System (AFIS) and the Petitioner came back as a possible match. After further forensic analysis, Memphis Police Department Latent Print Examiner Martin Milner concluded that the print matched the [P]etitioner.

The post-conviction court went on to note that the Petitioner did not raise an issue with the method of testing but instead argued that testing by Examiner Milner was not "independent testing." It concluded, however, that the petition failed to provide a factual basis for the petition's implication that Examiner Milner was not impartial. It further found that the petition failed to provide any specific issue that would be resolved by additional analysis. Finally, the court found that there was not a new method or technology that was substantially more probative that the prior analysis. We agree with the post-conviction court.

The evidence proves that the palm print on the window was tested for fingerprints. As Examiner Milner testified, a computer program generated several possible matches, and

9

the Petitioner was one possible match.  After further review, Examiner Milner determined that the Petitioner's print matched the palm print on the window.  This palm print was located on the window next to the seat where Mr. Wiseman had testified the Petitioner was sitting.  The Petitioner makes bare allegations that there exists a new method of fingerprint testing that is more probative.  He does not provide any support for this allegation.  As such, we conclude that the post-conviction court did not abuse its discretion when it summarily determined that the Petitioner had not met the requirements of relief pursuant to the Fingerprint Analysis Act.

## B. Gun

The Petitioner requested in his petition that the gun found at the crime scene be tested for fingerprints.  Importantly, there is no evidence that this weapon was used in the crime, and the State did not allege that it was the murder weapon.

The post-conviction court relied on the "reasonable probability" requirement found in sections 404(1) and 405(1) as the basis for its denial of the Petitioner's request.  *See* T.C.A. § 40-30-404(1) and -405(1).  "The definition of 'reasonable probability' has been well-established in other contexts, and is traditionally articulated as 'a probability sufficient to undermine confidence in the outcome'" of the prosecution.  *Powers*, 343 S.W.3d at 54 (first quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009); and then quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

The post-conviction court's analysis begins with the proposition that the fingerprint analysis, if done, will prove to be favorable to the petitioner.  *Smith*, 2022 WL 854438, at *14; *see Powers*, 343 S.W.3d at 55, n.28.  Courts must consider the evidence that was presented against the petitioner at trial, but the evidence must be viewed in light of the effect that favorable fingerprint evidence would have had on the fact-finder or the State.  *Smith*, 2022 WL 854438, at *14; *see Powers*, 343 S.W.3d at 55.  "[T]he analysis must focus on the strength of the [fingerprint] evidence as compared to the evidence presented at trial – that is, the way in which the particular evidence of innocence interacts with the evidence of guilt."  *Smith*, 2022 WL 854438, at *14 (quoting *Powers*, 343 S.W.3d at 55).

Because the post-conviction court is not required to hold a hearing in order to determine whether testing should be granted, the opinions of the appellate courts from direct appeal or previous post-conviction actions can "provide the essential facts of the crime at issue."  *Id*. (quoting *Powers*, 343 S.W.3d at 56).  However, previous appeals should not be used to determine the merits of any claim, such as whether the reasonable probability threshold has been established.  *Id.*; *see Powers*, 343 S.W.3d at 56.  "" *Smith*, 2022 WL 854438, at *14 (quoting *Powers*, 343 S.W.3d at 57).

In this case, the post-conviction court discussed the facts and the law.  Then, about the weapon, the post-conviction court noted that the Fingerprint Analysis Act requires that

there is a reasonable probability that the Petitioner would not have been convicted if exculpatory results had been obtained through fingerprint analysis. The court then noted that it was unclear from the facts at trial whether the handgun found by law enforcement was at all related to the shooting in this case. It was found on a car on the used car lot where the kidnapping occurred. The court summarized the evidence as follows:

> Ray Norris and Petitioner arrived at Just for You Auto Sales in a white Dodge Stratus. Petitioner forced Victim Wiseman into the trunk of a black Lexus. The Lexus started moving and 5 to 10 minutes passed before Wiseman heard a gunshot and the door open[ed]. Windom got out of the Lexus, ran into the Mapco parking lot, and collapsed. The victim was found at the Mapco gas station on Tchulahoma, which is several miles from Just for You Auto Sales. Wiseman was able to exit the trunk of the Lexus after the vehicle stopped in the Southwood Apartment Complex, which is also located several miles from the Just for You Auto Sales.

Considering this evidence, the post-conviction court held that, "the most favorable outcome of testing for the [P]etitioner would be the absence of his fingerprints on the handgun." This result, however, would not contradict the evidence presented in this case, as the State's case was not dependent on the handgun being related to the incident.

The post-conviction court's reasoning is sound. The results of testing the gun for prints in this case could have three possible outcomes: the prints could match the Petitioner; the prints could match another person; or the prints could be inconclusive or nonexistent prints. Any of these outcomes would not have had an effect on the trial. The State did not present this weapon as the murder weapon, did not allege it was involved in the offense or that the Petitioner ever held that weapon, and did not present it as incriminatory evidence to the jury. The results of fingerprint testing, therefore, would not have affected the outcome of the trial. The Petitioner is not entitled to relief.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

11